# District of Columbia
# Court of Appeals

**No. 14-CM-1151**

TAMEKA PARKER,

                                 Appellant,

    v.

UNITED STATES,

                                 Appellee.

FILED

MAR **16** 2017

DISTRICT OF COLUMBIA
COURT OF APPEALS

**CMD-1122-14**

On Appeal from the Superior Court of the District of Columbia
Criminal Division

      BEFORE:  THOMPSON and EASTERLY, *Associate Judges*; and FERREN, *Senior Judge.*

## J U D G M E N T

      This case was submitted to the court on the transcript of record and the briefs filed, and without presentation of oral argument.  On consideration whereof, and for the reasons set forth in the opinion filed this date, it is now hereby

      ORDERED and ADJUDGED that appellant's conviction for simple assault is reversed.

                           For the Court:

                           JULIO A. CASTILLO
                           Clerk of the Court

Dated: March 16, 2017.

Opinion by Associate Judge Catharine Easterly.

Concurring opinion by Senior Judge John M. Ferren.

Dissenting opinion by Associate Judge Phyllis D. Thompson.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CM-1151

FILED 3/16/17
District of Columbia
Court of Appeals

*Julio Castillo
Clerk of Court*

TAMEKA PARKER, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CMD-11272-14)

(Hon. Judith N. Macaluso, Trial Judge)

(Submitted November 12, 2015             Decided March16, 2017)

*Paul J. Riley* was on the brief for appellant.

*Vincent H. Cohen, Jr.*, Acting United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Sarah Vanore*, and *Edward G. Burley*, Assistant United States Attorneys, were on the brief for appellee.

Before THOMPSON and EASTERLY, *Associate Judges*, and FERREN, *Senior Judge*.

Opinion for the court by *Associate Judge* EASTERLY.

Concurring opinion by *Senior Judge* FERREN at page 27.

Dissenting opinion by *Associate Judge* THOMPSON at page 42.

EASTERLY, *Associate Judge*: Tameka Parker appeals her conviction, following a bench trial, for simple assault.[1] She argues that the evidence was insufficient to disprove her claim of self-defense. The trial court determined that Ms. Parker reasonably believed that she was in imminent danger of bodily harm when Frederick Powell and members of his family accosted her in front of her home and Mr. Powell threatened and then spit on her. Nonetheless, the trial court rejected Ms. Parker's claim that she was acting in self-defense when, in response to Mr. Powell spitting on her, she spit back on him. The trial court determined that Ms. Parker, although actually and reasonably afraid of Mr. Powell, had acted with a retaliatory motive that defeated her claim of self-defense.

We question whether the record evidence supports the trial court's determination that Ms. Parker's motivation was purely retributive, but ultimately conclude that the trial court erred as a matter of law in conducting a separate inquiry into Ms. Parker's motive. Under the District's long-standing common law test for self-defense, captured in our standard jury instructions, whether the government has disproved a claim of self-defense turns on two questions: (1) whether a defendant reasonably believed that she was in imminent danger of

---

[1] D.C. Code § 22-404 (a)(1) (2016 Supp.).

bodily harm (an inquiry that may be informed, among other things, by motive evidence presented by the government); and (2) if so, whether the force used was excessive. Motive is not separately and additionally considered as a basis for disproving a claim of self-defense. In this case, the trial court found that Ms. Parker's belief she was in imminent danger was reasonable and there was never an argument that her act of spitting on Mr. Powell constituted excessive force. As there was no basis for the trial court to reject Ms. Parker's claim of self-defense, we reverse.

## I. Facts[2]

Early one evening in June 2014, Ms. Parker walked out of her home where she lived with her three children. She was about to get into a friend's car, when she heard Mr. Powell[3] yell from across the street that he "should go over and smack the shit out of that bitch." When Ms. Parker asked to whom he was speaking, Mr. Powell crossed the street and came onto her property, positioned himself so that he

---

[2] For the narrative of the incident, we primarily rely on Ms. Parker's testimony which the trial court credited in all material respects.

[3] Ms. Parker had no personal relationship with Mr. Powell, but, more than a year prior to this incident, he and Ms. Parker's daughter had been romantically involved.

and Ms. Parker were face-to-face, and said, "bitch, you."  Mr. Powell's "aggressi[ve]" approach indicated to Ms. Parker that "he was trying to fight [her]," and Mr. Powell asked her "do you want that smoke," a question Ms. Parker understood as a threat to shoot her.

Mr. Powell's mother crossed the street with him, and several of his brothers joined them on Ms. Parker's property; the family surrounded her friend's car and yelled insults at Ms. Parker.  They called her a "dirty bitch" and accused her of being "hot," *i.e.*, "working with the police."  "[T]here were a lot of them," and Ms. Parker "fear[ed] for [her] life."

When he was less than two feet away from her, Mr. Powell spit in her face. Ms. Parker was "really was scared" once Mr. Powell spit on her, because she "didn't know what he was going to do next."  She spit back.[4]

At about that time, unbeknownst to Ms. Parker,[5] a police officer arrived.

---

[4]  She also threw an unopened can of soda into "the middle of the street," without hitting Mr. Powell.  She explained, "I didn't throw it at him exactly.  I just threw it . . . .  I don't know, I was scared."

[5]  Ms. Parker testified that she did not realize a police officer was on the scene until he walked up to her.

While sitting in his car, the officer saw Mr. Powell face-to-face with Ms. Parker, surrounded by approximately ten people,[6] all standing near a car and yelling at each other. The officer could not hear what they were saying, but he saw Ms. Parker spit on Mr. Powell. When he spoke to her at the scene, she explained (because the officer had not seen the entire encounter and in particular, had not seen Mr. Powell spit on Ms. Parker) "that she wouldn't just spit on him for no reason, that he spit on her first." The officer then arrested Ms. Parker for simple assault.

At trial, Mr. Powell did not testify and the government called only one witness, the arresting officer. Ms. Parker testified on her own behalf. Ms. Parker conceded that she spit on Mr. Powell but claimed she was acting in self-defense. On direct and cross-examination, Ms. Parker repeatedly testified that she was afraid of Mr. Powell. On direct, Ms. Parker was asked what she believed was going to happen at the time she spat back at Mr. Powell and she said, "I thought he was going to hit me, honestly that was the next thing. I was fearing for my life. . . . I am scared for my life, like I didn't know what they w[ere] going to do." On cross-examination, she specifically denied being angry: "I wasn't angry. I was

---

[6] According to the officer, by this time "[h]is family was out. Her family was out . . . ."

scared for my life. . . . I was more scared than anything." In response to a follow-up question from the court—"Why is it that you spit in [Mr. Powell's] face?"—she explained, as she had to the police officer, that she had spit on Mr. Powell "[b]ecause he came on my property and . . . spit on me first." Finally, on redirect, Ms. Parker once again explained why she had spit on Mr. Powell:

> It was just that he spit in my face and I felt scared with the way they approached me that day. They approached me in a scary situation. I had a lot of people approach me at one time and I really did not know what I did or what I did wrong for him to say he was going to smack me and walk on to my property and then to spit in my face.

The government argued in closing that it had carried its burden to show that "the defendant was not in fear of imminent bodily harm which is the standard of self-defense." Instead the government asserted that the evidence established that Ms. Parker was "very angry," "indignant," and "offended by what she states that the complainant did to her." The government further asserted that Ms. Parker had not "expressed a fear of imminent bodily injury. What she has expressed is being angry at this complainant and not liking this complainant." The government then highlighted Ms. Parker's testimony that she had spit on Mr. Powell because he spit on her. The defense countered in its closing that there was "absolutely no reason or evidence to believe that Ms. Parker wasn't afraid and, in fact, it is to the

contrary." "[T]here is evidence and there is testimony that she was actually afraid . . . and that she had reasonable grounds for that belief."

The trial court, after determining that Ms. Parker's spitting was an assaultive act, rejected her claim of self-defense, but not on the ground urged by the government. Preliminarily, the court "instruct[ed] [it]self" on the law of self-defense and acknowledged that "every person has the right to use a reasonable amount of force in self-defense if one, she actually believes she is in imminent danger of bodily harm and if two, she has reasonable grounds for that belief."[7] The court then found, contrary to the government's argument, that Ms. Parker did reasonably believe herself to be in such danger:

> I conclude based on this record that Ms. Parker reasonably believed that she was in imminent danger of bodily harm. I think it is a very rich record with respect to her belief of imminent bodily harm and the reasonableness of that belief. She testified entirely credibly with no impeachment at all that amounted to anything except a minor difference in recollection about exactly what the spacing of the complaining witness and Ms. Parker was, that she was walking out of her door to get into her friend's car and as she was doing nothing more than walking to a car, Mr. Powell who was sitting

---

[7] The court appeared to be reading verbatim from the standard jury instruction on "Self-Defense—General Considerations." Criminal Jury Instructions for the District of Columba, No. 9.500 (5th ed. rev. 2014).

nearby on his family's porch said loudly enough for her to hear, I should go over there and smack the shit out of that bitch, and he then approached her walking across the street like he was going to fight her and he was backed up by his mother who was also saying aggressive things towards Ms. Parker. They were saying such things as, bitch, you hot, which meant that she was working with the police and, you want that smoke, which was a threat to shoot and he got right up in her face and she said, who you talking to, and he said, bitch, you, and she said, whatever, little boy, get out of my face, at which point he spit on her and a half a dozen members of his family were also approaching her and backing him up.

The court also "credit[ed] Ms. Parker's testimony that she didn't realize that Officer Bradley was there" and thus did not appreciate she could have asked him for help:

It is perfectly believable to me that with people shouting at each other, with her attention focused on what is going on and having been spit on, on having been threatened, on the mother coming across the street and yelling at her also on the back up of the relatives, that she is looking at all of that and everything else that is occurring is somewhere in the background noise and not quite registering for her. So, I don't think that it detracts from her credibility that the officer was there and she could easily have turned to the officer and said, look what he did and then he would be prosecuted before me for assault instead of her. I accept Ms. Parker's explanation that she was afraid even though she didn't get in the car. It is her judgment whether she is at more risk in a confined space than she is out in the open. She had family members to access to her as long as she was out in the open. I am not going to question that judgment and I don't think it detracts from her testimony that she

actually did fear that she was in imminent danger of bodily harm that she didn't get into the car. That is a judgment that you make at the time and it was for her to make at that time.

Although the court found that Ms. Parker reasonably believed herself to be endangered by Mr. Powell and his entourage, the court nonetheless concluded that Ms. Parker's self-defense claim failed because of what it perceived to be Ms. Parker's motive in responding to Mr. Powell:

It is [e]minently reasonable that with those threats and that expressed motivation and that backup she would feel herself in imminent danger and I find that she did, but in order for self-defense to apply she has to use a reasonable amount of force in self-defense.[8] Using a reasonable amount of force is [not[9]] because she is angry or indignant or outraged or because of injustice, if somebody spits in your face[,] which is what he did, that person deserves to be spit on and should expect to be spit on, [but] that is not self-defense. That is spitting[,] but not for purposes of self-defense[,] and the government has proven on this record that the spitting occurred not for reasons of self-defense but for those other reasons. The government correctly argues that every time Ms. Parker is asked, why did you spit on him, the immediate

---

[8] Here, it appears the court was referring to the standard jury instruction on "Self-Defense—Amount of Force Permissible." Criminal Jury Instructions for the District of Columba, No. 9.501. But the court did not read from this instruction verbatim, and thus misapplied it to the facts of this case. *See infra* p. 26.

[9] It appears that either the court reporter failed to transcribe the word "not," or that the trial court misspoke.

answer is, because he spit on me, and that was said directly on the scene to the police officer. The answer to the same effect was indeed given to the prosecutor, I spit on him because he spit on me, and I directly asked, why did you spit on him. I spit in his face because he came on my property and he spit on me first and there is street justice in that. That is fine in a sense, in a fairness sense and I will take account of sentencing time but it is not fine when it comes to the law of the District of Columbia because what could have been expected to happen next if that police officer had not been there was that Mr. Powell backed up by his family and surrounding Ms. Parker the way he was and having just been spat on would have made good on some of those threats, not the shoot you threat but the beat the [shit] part of the threat. They had the numbers and they had the anger and they had their expressed motivation.

The court concluded that "[f]or all th[e]se reasons . . . the government ha[d] proved beyond a reasonable doubt that Ms. Parker committed the offense of simple assault and did not spit on Mr. Powell as an act of self-defense."

## II. Analysis

When a defendant "present[s] any evidence that she acted in self-defense," the government assumes the burden of proving, beyond a reasonable doubt, that she did not. *See Williams* (*Shirley*) *v. United States*, 90 A.3d 1124, 1128 (D.C. 2014). In this case, Ms. Parker argues that the government failed to present sufficient evidence that she did not act in self-defense when she spit on Mr.

Powell. We review sufficiency of the evidence claims de novo. *High v. United States*, 128 A.3d 1017, 1020 (D.C. 2015).[10] In so doing, "we consider all the evidence in the light most favorable to the government, according deference to the fact-finder to weigh the evidence, determine the credibility of the witnesses, and draw all justifiable inferences of fact." *Williams* (*Furl*) *v. United States*, 113 A.3d 554, 560 (D.C. 2015). If we find "no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt," we must reverse. *Id.*

Here, the trial court credited Ms. Parker's testimony that she "was afraid," and determined that she subjectively and reasonably believed that she was in imminent danger of bodily harm from Mr. Powell[11] after he and his family

---

[10] Sufficiency claims implicate the Due Process Clause, which requires that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979).

[11] The trial court and Ms. Parker herself described her response to her encounter with Mr. Powell in terms of fear. To clarify, fear is an emotion that is presumably often experienced by a person who has a right to defend herself. And evidence of fear will support a conclusion that that person actually and reasonably believed that she was in imminent danger of bodily harm. But if a person is confident in her ability to defend herself and does not feel afraid when she is placed in a situation where she actually and reasonably believes that she is in imminent danger of bodily harm, she would still have a right to act to prevent that harm and later claim self-defense.

encircled, insulted, and threatened her, and he spit on her. Nevertheless, the court concluded the government had presented sufficient evidence to prove beyond a reasonable doubt that Ms. Parker was not acting in self-defense because it somehow discerned that Ms. Parker's fear and reasonable belief that she was in imminent danger did not motivate her to spit on Mr. Powell. Instead the court detected from the evidence that Ms. Parker was motivated by "ang[er], indigna[tion] or outrage[]"—a desire to impose what the court called "street justice."

As a preliminary matter, we question whether the record supports the court's finding that Ms. Parker acted out of a purely retributive motive. *See High*, 128 A.3d at 1020 (noting that we defer to the trial court's credibility determinations and findings of fact from a bench trial unless they are "plainly wrong or without evidence to support [them]" (alteration in original)). The government's only witness, the arresting officer, could not testify to much more than the fact that he had seen Ms. Parker spit on Mr. Powell, and he did not attribute any emotion to her, much less describe her as being angry or indignant. For her part, Ms. Parker never indicated that she had the "street justice" motive that the court imputed to her. Moreover, she denied that she was angry, and she was not impeached on this point. In short, the record evidence was that Ms. Parker "was scared for her

life"—the reasonable inference being that she acted upon her reasonable belief that she was in imminent danger.

The trial court's contrary motive determination appears to be based entirely on Ms. Parker's initial explanation to the police officer and her subsequent testimony in court that she spit on Mr. Powell because "he spit on me first."[12]  The court inferred from this explanation that, notwithstanding her credited testimony to the contrary, Ms. Parker was "angry or indignant or outraged" and was motivated to act solely based on these emotions.

We are doubtful that Ms. Parker's admissions that her action was responsive to Mr. Powell's initial assault can carry the retributive meaning the court ascribed to them.  It seems more likely that her statement to the police officer—who arrived in the midst of the incident and whom Ms. Parker did not see until he approached her to place her under arrest—was made to ensure that the officer understood the full sequence of events and, in particular, that she was not the first aggressor.

---

[12]  The government had highlighted this testimony for the court, but for the distinct purpose of proving that Ms. Parker did not subjectively believe she was in imminent danger of bodily harm.  Although the government now seeks to defend the trial court's separate motive analysis, it did not seek to rebut Ms. Parker's claim of self-defense on this basis at trial.

Similarly, her response to the court's "why" inquiry, taken in context of her previous and subsequent expressions of fear, seems more susceptible to a benign interpretation that is entirely congruent with her claim of self-defense: to repel the reasonably perceived danger, she fought fire with fire; she matched one spitting assault (Mr. Powell's) with another (hers) to communicate that she would give as good as she got and that Mr. Powell should leave her alone. Furthermore, when considered in the context of her fully credited testimony, in which she unambiguously related her fear of Mr. Powell, it is difficult if not impossible to accept that Ms. Parker's he-spit-on-me-first statement alone establishes, beyond a reasonable doubt, that Ms. Parker was motivated solely by a desire to impose "street justice."[13] *See Williams* (*Shirley*), 90 A.3d at 1129 n.6 (holding that the defendant's "ambiguous statement d[id] not tip the balance of the weight of the evidence to the extent that it dispel[led] any reasonable doubt" that she was acting

---

[13] Our dissenting colleague asserts that the court's statements "reflect a recognition that what was missing each time from appellant's explanation of why she spit on [Mr.] Powell was any statement to the effect that she spit on him in an effort to protect herself from harm." *Post*, at 46 (dissenting opinion). But Ms. Parker repeatedly made it clear that she was afraid of Mr. Powell. And it was not Ms. Parker's burden to prove that she acted in self-defense; it was the government's burden to prove that she did not.

in self-defense).[14]  Instead, at most, the evidence supports only a determination that

Ms. Parker was motivated to spit on Mr. Powell by a mixture of fear and anger.[15]

---

[14]  In *Williams*, we held that a defendant's statement while holding a knife—
"You think I'm crazy? I'm going to show you crazy"—was subject to at least "two
reasonable interpretations":  (1) she was "letting others know whom she felt were
out to do her harm that she was willing to defend herself, even so far as using the
knife"; or (2) she was making a threat.  *Id.* at 1129 n.6.  And thus we held that the
statement could not be relied upon by the government to carry its burden to
disprove the defendant's self-defense claim beyond a reasonable doubt.  *Id.*

[15]  Evidence that a defendant has mixed emotions, however, will not defeat a
claim of self-defense.  Again, the proper inquiry is whether the defendant believed
she was in imminent danger, not whether she was or was not fearful.  *See supra*
note 11.  Moreover, as humans rarely experience one emotion at a time, it is only
to be expected that, in a situation where a person might need to act in self-defense,
she will experience some mix of fear and anger or indignation or vindictiveness.
*Cf. Brown v. United States*, 256 U.S. 335, 343 (1921) (noting that as the common
law of self-defense has evolved over time, "it has tended in the direction of rules
consistent with human nature").  Thus, if the government could carry its burden to
disprove a claim of self-defense simply by establishing that a defendant who
actually and reasonably believed she was in imminent danger also experienced
other emotions or had mixed motives, self-defense claims would be severely
curtailed, if not eliminated entirely.  *See People v. Nguyen*, 354 P.3d 90, 113 (Cal.
2015) ("[I]t would be unreasonable to require an absence of any feeling other than
fear, before [use of force] could be considered justifiable [self-defense]."); *State v.
Adviento*, 319 P.3d 1131, 1157 (Haw. 2014) (observing that "actions taken in self-
defense may indeed be committed while the defendant is subject to a certain degree
of terror, resentment, rage or anger"); Wayne R. LaFave, *Substantive Criminal
Law* § 10.4 (c) (2d ed.) (noting that a defendant acting in self-defense "does not
lose the defense because [s]he acts with some less admirable motive in addition to
that of defending [her]self," as in a situation where the defendant also "us[es] force
upon h[er] adversary because [s]he hates him").  In short, the government will
prevail over a claim of self-defense only when it proves that the defendant did not
reasonably believe that she was in imminent danger of bodily harm, *see infra* p.
27—not when it proves the defendant reasonably experienced other emotions.

We need not decide whether the trial court made a factfinding error, however, because the trial court's focus on motive begs a more fundamental question of law: if the government fails to disprove that a defendant reasonably believed that she was in imminent danger of bodily harm, can it still carry its burden to rebut a claim of self-defense by showing that there was another motive guiding the defendant's action? For the reasons discussed below, we conclude that, under this court's long-standing articulation of the two-part test for the defense of self-defense captured in our standard jury instructions, it cannot.

"The essence of the self-defense situation is a reasonable and bona fide belief of the imminence of . . . bodily harm."[16] *Kinard v. United States*, 96 F.2d 522, 526 (D.C. Cir. 1938).[17] Thus, in numerous cases, this court has acknowledged that when a claim of self-defense is raised, the threshold question for the fact finder

---

[16] The requisite level of reasonably perceived danger is different, depending on whether the defendant employed deadly or nondeadly force: "where an accused, claiming self-defense, uses deadly force, he must—at the time of the incident—actually believe and reasonably believe that he is in imminent peril of death or serious bodily harm; whereas one utilizing nondeadly force must show that he reasonably believed that [some] harm was imminent." *Ewell v. United States*, 72 A.3d 127, 131 (D.C. 2013).

[17] Decisions of the D.C. Circuit prior to February 1, 1971, are binding on this court per *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

is whether the government has disproved that the "appellant actually and reasonably believed that [s]he was in imminent danger of bodily harm." *Higgenbottom v. United States*, 923 A.2d 891, 900 (D.C. 2007).[18] And our standard jury instruction on self-defense directs that:

> Every person has the right to use a reasonable amount of force in self-defense if (1) s/he actually believes s/he is in imminent danger of bodily harm and if (2) s/he has reasonable grounds for that belief. The question is not whether looking back on the incident you believe that the use of force was necessary. The question is whether [name of the defendant], under the circumstances as they appeared to him/her at the time of the incident, actually believed s/he was in imminent danger of bodily harm, and could reasonably hold that belief.

Criminal Jury Instructions for the District of Columbia, No. 9.500 (5th ed. rev.

---

[18] *See also Kittle v. United States*, 65 A.3d 1144, 1158 (D.C. 2013) ("To invoke self-defense, there must be some evidence that: '(1) [appellant] actually believed he was in imminent danger of bodily harm, and (2) he had reasonable grounds for that belief.'") (quoting *Guillard v. United States*, 596 A.2d 60, 63 (D.C. 1991)); *Snell v. United States*, 754 A.2d 289, 290 (D.C. 2000) ("Reasonable force may be used in self-defense if the actor reasonably believes that he or she is in imminent danger of bodily harm."); *McPhaul v. United States*, 452 A.2d 371, 374 & n.2 (D.C. 1982) (upholding the instructions that "emphasized the general concept of the self-defense doctrine" and told the jury, inter alia, that the defendant had a right to act in self-defense if "one, he actually believes he is in imminent danger of bodily harm; and, two, if he has reasonable grounds for that belief").

2014) ("Self Defense—General Considerations").[19]

If there is evidence that the defendant actually and reasonably believed herself to be in imminent danger of bodily harm—i.e., if the government cannot prove beyond a reasonable doubt that the defendant did not have such a belief—the inquiry proceeds to the amount of force employed. A defendant may use "only reasonable force to repel the perceived attack." *Higgenbottom*, 923 A.2d at 900. Or, rephrased in the context of the government's burden of proof, "[i]n a situation where the evidence establishes that self-defense would otherwise be justified," the government can rebut a self-defense claim only if it proves that a defendant used "excessive force." *Williams*, 90 A.3d at 1128. But distinguishing what constitutes excessive force from a "reasonable amount of force" is not a wholly objective inquiry; the factfinder must take into account evidence of the defendant's mental state under the circumstances. *See Fersner v. United States*, 482 A.2d 387, 391–92 (D.C. 1984) ("[T]he victim's subjective perceptions are the prime determinant of the right to use force—and the degree of force required—in self-defense, subject

---

[19] Nearly identical standard instructions have been employed in the District since 1972. *See* Criminal Jury Instructions for the District of Columbia, No. 5.13 (2d ed. 1972) ("Self Defense—General Considerations").

only to the constraint that those perceptions be reasonable under the circumstances.").[20]

> [T]he claim of self-defense is not necessarily defeated if, for example, more knife blows than would have seemed necessary in cold blood are struck in the heat of passion generated by the unsought altercation. A belief which may be unreasonable in cold blood may be actually and reasonably entertained in the heat of passion.

*Inge v. United States*, 356 F.2d 345, 348 (D.C. Cir. 1966).[21] The question is thus whether the defendant's use of force is "a proportionate reaction to the threat that [s]he perceived" while in the heat of the moment. *Ewell*, 72 A.3d at 130. Again, this is reflected in the standard jury instruction entitled "Amount of Force Permissible," which explains that a defendant confronting nondeadly force[22] may employ "a reasonable amount of force" as informed by her subjective assessment

---

[20] *See id.* at 391 ("The right of self-defense, and especially the degree of force the victim is permitted to use to prevent bodily harm, is premised substantially on the victim's own reasonable perceptions of what is happening.").

[21] *See also Brown*, 256 U.S. at 343 ("Detached reflection cannot be demanded in the presence of an uplifted knife."); *Williams* (*Shirley*), 90 A.3d at 1128 ("[T]he fact-finder must take into account that the defendant was acting in the 'heat of the conflict.'") (quoting *Brown*, 256 U.S. at 344); *Perry v. United States*, 422 F.2d 697, 698 (D.C. Cir. 1969) (citing *Inge* and reaffirming that the fact-finder must "consider . . . whether the defender in the heat of an attack actually entertained a belief which would be unreasonable in one acting in cold blood").

[22] There is an analogous instruction for use of deadly force. Criminal Jury Instructions for the District of Columba, No. 9.501.B.

of the circumstances. The instructions first state that "[a] person may use an *amount of force* which, at the time of the incident, *s/he actually and reasonably believes is necessary* to protect himself/herself from imminent bodily harm." Criminal Jury Instructions for the District of Columba, No. 9.501.A (emphases added). The instructions further provide that "[a] person acting in the heat of passion, . . . does not necessarily lose [her] claim of self-defense by using greater force than would seem necessary to a calm mind. In the heat of passion, a person may actually and reasonably believe something that seems unreasonable to a calm mind." Criminal Jury Instructions for the District of Columbia, No. 9.501.C.

Under this construct—where the first inquiry is whether a defendant actually and reasonably believed she was in imminent danger of bodily harm and the second inquiry is whether, taking this belief into account, she employed excessive force—motive is not an additional, separate consideration.[23] If the government has

---

[23] Our colleague in dissent faults us for relying on "truncated discussions of the law of self-defense," *post*, at 54 (dissenting opinion), but these discussions capture the operative core of our test for self-defense and fully align with our standard jury instructions.

By contrast, the dissent seeks to create a new, additional requirement that a defendant must have "believed that her action . . . was *necessary to save herself.*" *Post*, at 42 (dissenting opinion) (brackets omitted) (emphasis added); *see also id* at 49–50 & n.7, 60–61. But the dissent's separate subjective "necessity" test has no support in the decisions of this court. To be sure, the admonition in *Holmes v.*

(continued…)

not disproved that a defendant actually and reasonably believed she was in imminent danger of bodily harm, we accept that she acted out of that belief.[24] *See*

---

(…continued)

*United States*, 11 F.2d 569, 574 (D.C. Cir. 1926), that "the law of self-defense is a law of necessity," has been often quoted by this court; but it does not authorize a distinct inquiry into a defendant's subjective assessment of the necessity or likely effectiveness of her actions. Rather, in *Holmes* (a murder case), the court concluded that the evidence was sufficient to allow the jury to determine that it was not "necessary" for the defendant to employ *deadly* force in self-defense, either because the "appellant did not believe himself in imminent danger when he handed a weapon to [his co-defendant], requesting him to use it," or because his use of force to resist a lawful arrest was excessive. *Id.*

All of the cases cited by our dissenting colleague that refer to "necessity" support this understanding of the law of self-defense. They discuss necessity either in the context of step one of our self-defense test, examining whether the defendant reasonably believed he was in imminent danger of bodily harm, *see, e.g.*, *Edwards v. United States*, 721 A.2d 938, 941, 943 (D.C. 1998) (cited *post*, at 42 n.1 (dissenting opinion)), or in the context of step two of our self-defense test, examining whether the defendant employed excessive force, *see Travers v. United States*, 124 A.3d 634, 639 (2015); *Higgenbottom*, 923 A.2d at 900–01; *McPhaul*, 452 A.2d at 373 n.1. In addition, the dissent cites one case, *Potter v. United States*, 534 A.2d 943, 946 (D.C. 1987) (cited *post*, at 50 (dissenting opinion)), that does not reference "necessity" at all and conducts a step one analysis to conclude that a self-defense instruction should have been given, because a jury could have found that defendant "believe[d], reasonably, that he had to throw a brick to fend off imminent bodily harm." The dissent cannot point to a single case where this court has indicated—much less held—that, even where a defendant actually and reasonably believed she was in imminent danger of bodily harm and employed a reasonable amount of force, the government may yet disprove a claim of self-defense on the ground that the defendant did not subjectively believe her use of force was "necessary to save herself." In short, the majority opinion is firmly grounded in the law of this jurisdiction; the dissent is not.

[24] In a circumstance where a person actually and reasonably believed that she was in imminent danger of bodily harm, it would be functionally impossible for the government to prove beyond a reasonable doubt that the defendant's (actual

(continued…)

*Garibay v. United States*, 634 A.2d 946, 948 (D.C. 1993) (explaining the binary

motive inquiry by juxtaposing two possible outcomes: "a self-defense claim raises

the issue of whether the defendant was acting out of an actual and reasonable fear

of imminent bodily harm, or whether, instead, the defendant had some other

motive and was, in fact, the aggressor"); *see also Rink v. United States*, 388 A.2d

52, 56 (D.C. 1978) (holding that motive evidence is admissible to address "whether

appellant reasonably apprehended a danger of imminent, serious bodily harm from

the deceased"); *Flores v. United States*, 698 A.2d 474, 482–83 (D.C. 1997) (citing

*Garibay* to allow evidence of prior violent acts to show that defendant was the first

aggressor).[25]  This construct is reflected in our cases assessing sufficiency of the

---

(…continued)
and reasonable) belief was not, at the very least, a significant component of the motivation behind actions that the defendant took.  Our dissenting colleague concedes the difficulty, *post*, at 53 (dissenting opinion), but does not address (on these facts or more generally) how a trial court could possibly determine that the government had proved beyond a reasonable doubt that a defendant, who actually and reasonably believed she was in imminent danger, had a different guiding motive, *id.*

[25]  Conversely, if the defendant is shown not to have actually and subjectively believed that she was in imminent danger of bodily harm because the evidence establishes that the defendant acted solely out of anger or because she had an axe to grind, her self-defense claim would fail at the first step.  *See, e.g.*, *Brown*, 256 U.S. at 344 (noting that, where the defendant and decedent had a contentious history, the jury might have thought that the defendant "had not sufficient reason to think that his life was in danger at that time, that he exceeded the limits of reasonable self defen[s]e or even that he was the attacking party"); *Kittle*, 65 A.3d at 1159 (determining that the complainant's testimony that his action to restrain
(continued…)

evidence challenges:  claims of self-defense rise or fall on determinations of whether the defendant reasonably believed herself to be in imminent danger of bodily harm or used excessive force.[26]

To our knowledge, this court has never held that, despite evidence that the defendant actually and reasonably believed she was in imminent danger of bodily harm, her self-defense claim had been adequately disproved on the ground that the defendant had somehow set aside her belief and acted purely out of a different motive—e.g., anger or a desire for retribution.  The government does not cite to any such case.[27]  And notably, neither does our dissenting colleague.[28]

---

(…continued)

defendant made him "'mad' . . . . indicates that appellant did not wish to be held by [the complainant], [and] does not establish that appellant was frightened or believed that he was in imminent harm" so as to provide a basis for a reasonable doubt instruction); *Snell*, 754 A.2d at 290–91 (concluding that, where evidence established, inter alia, that appellant "had been involved in a prior violent confrontation," the trial court "applied the relevant standard, namely, that there was evidence upon which a reasonable mind could find beyond a reasonable doubt that appellant did not reasonably believe he was in imminent danger of bodily harm").

[26]  Of course, where the government proves beyond a reasonable doubt that the defendant was "the [first] aggressor" or "provoked the conflict upon herself," the fact-finder need not even reach the core self-defense inquiry.  *See* Criminal Jury Instructions for the District of Columba, No. 9.504.A.

[27]  In its brief, the government asserts that it was "permissibl[e]" for the trial court to determine that Ms. Parker's "desire to retaliate against Mr. Powell for

(continued…)

---

(…continued)

spitting on her first" overrode its determination that Ms. Parker subjectively and reasonably believed that she was in imminent danger of bodily harm. But the only authority from this court the government cites for this proposition is *Medley v. United States*, 104 A.3d 115 (D.C. 2014). In *Medley*, we adhered to *Garibay* and reaffirmed that motive evidence—in that case, "outrage" at the victim for giving drugs to the defendant's girlfriend—is admissible to negate a defendant's narrative that he was subjectively afraid. *Id.* at 129. We did not hold, or even suggest, that once the court had concluded that the defendant was subjectively afraid, such outrage could be independently considered to establish the defendant's "true" motive.

The government also cites two unpublished decisions from the intermediate appellate court of Kansas (which have no precedential authority even in that jurisdiction and are not favored for citation under Kansas Supreme Court Rule 7.04 (f)) where spitting was found, based on the facts alleged, not to be an act of self-defense (while recognizing that there might be factual scenarios where it would be). But in each of these cases, the intermediate appellate court concluded that the evidence did not support a determination that the defendants subjectively and reasonably believed they were in danger of bodily harm. *State v. White*, No. 105,488, 2012 WL 1649841, at \*3 (Kan. Ct. App. May 4, 2012) ("There was no need for [defendant] to defend himself from any imminent use of unlawful force when he spit on [victim]."); *State v. Markou*, No. 104,931, 2011 WL 2802408, at \*2 (Kan. Ct. App. July 15, 2011) ("[Defendant]'s spitting was not done in defense of any imminent use of unlawful force.").

[28] See note 23 *supra*. Accordingly, our dissenting colleague's assertion, *post*, at 61 (dissenting opinion), that we are somehow disregarding binding precedent in contravention of *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971), is without foundation. The invocation of *M.A.P. v. Ryan* is especially confusing given our dissenting colleague's concession that "until now" this court has never been confronted with a case where, as here, the question was "whether the defendant used force that was so predictably ineffectual as to not qualify as force the defendant believed was necessary to protect herself." *Post*, at 55 (dissenting opinion).

In Ms. Parker's case, the trial court as the factfinder concluded that Ms. Parker actually and reasonably believed she was in imminent danger of bodily harm from Mr. Powell. At that point the only question left for the trial court was whether Ms. Parker had employed excessive force. Ms. Parker obviously did not use more force than was reasonable under the circumstances.[29] Thus the court should have determined that Ms. Parker acted in self-defense and acquitted her of assault.

But instead of acquitting Ms. Parker, the trial court appeared to misuse the inquiry into whether Ms. Parker had used "a reasonable amount of force," to circle back to Ms. Parker's motive in responding Mr. Powell's assault. It is correct that, in order for a factfinder to determine if a defendant employed excessive force, consideration should be given to whether a defendant subjectively perceived a need

---

[29] "Our cases upholding determinations of excessive force 'uniformly involve situations where the secondary, responsive aggression was completely disproportionate to the initial aggression faced.'" *Williams*, 90 A.3d at 1128 (quoting *Gay v. United States*, 12 A.3d 643, 649 (D.C. 2011)). The government never argued at trial that Ms. Parker's act of spitting back was disproportionate to being spit upon. To the extent the government now suggests that the act of spitting is inherently intemperate and cannot be self-defense as a matter of law, this division unanimously disagrees. *See post*, at 48 n.6 (dissenting opinion). We see no reason why, when a defendant reasonably believes herself to be in imminent danger, spitting should be distinguished from other types of assaultive conduct, particularly when being spit on is part of the conduct that induces the defendant's belief.

to employ such force to repel the threat. As explained above, however, this consideration of the defendant's subjective perceptions is meant to expand the boundaries of what constitutes reasonable force, "by tak[ing] into account that the defendant was acting in the 'heat of conflict.'" *Williams*, 90 A.3d at 1128. It is not meant to authorize a factfinder to separately assess a defendant's motive in responding to a reasonably perceived threat to her safety.[30]

Accordingly, we reaffirm that, when self-defense is raised, the proper inquiry with respect to a defendant's mental state (which motive evidence may inform) is whether she subjectively (and reasonably) believed that she was in imminent danger of bodily harm. The government bears the burden to prove that a defendant did not hold such a belief. Where, as here, the government fails to meet that burden—i.e., where it cannot disprove that the defendant subjectively and

---

[30] Nor is our concern under the excessive force inquiry the use of too little force. One of the trial court's reasons for rejecting Ms. Parker's claim of self-defense, seemingly embraced by our dissenting colleague, *post*, at 48 n.6 (dissenting opinion); *see also id.* at 56–59, was because, in the court's view, Ms. Parker's response was so ineffectual, it had no deterrent value and, had the police not been on site, was likely only to have only prompted a more severe response from Mr. Powell and his family. Again, we do not expect people to be purely rational actors in selecting the proper amount of force to use in response to a reasonably perceived threat to their safety, and we certainly have no desire to encourage individuals to make more aggressive showings of force to ensure they have a legal right to self-defense.

reasonably believed she was in imminent danger of bodily harm—and also fails to show that the defendant employed excessive force, the defendant must prevail on her self-defense claim.

### III. Conclusion

For the foregoing reasons, we reverse Ms. Parker's conviction for simple assault.

*So ordered.*

FERREN, *Senior Judge*, concurring:  I join the opinion of the court and write separately only to reinforce it with some additional perspective.

### I.

This is a strange case.  A man shouts an ugly slur against his neighbor across the street as she is getting into a friend's car.  He then crosses the street with members of his family, calls her a "bitch" (and more), and spits in her face as his family surrounds the car and hurls insults. She spits back.   Others arrive

(apparently including members of her family), and a shouting match ensues. In the meantime, a police officer has appeared in time to see her spit (but not to see her aggressor do so). The officer arrests her for simple assault, and she is charged.

In a bench trial the court finds that appellant "actually did fear" and "reasonably believed that she was in imminent danger of bodily harm," having testified that she was "scared for my life, like I didn't know what they were going to do." But the court disallows her claim of self-defense, concluding that her principal reason for spitting in response to her aggressor's liquid assault was that "he came on my property and . . . spit on me first" – words of anger, indignation, and outrage, said the court, not words of defense against attack. Moreover, the trial court appears to believe that mere spitting, while noxious though not excessive, was not an authentic defensive move. The court's ultimate characterization of her mindset – that she sought "street justice," not self-protection, in spitting back – summarizes the court's rejection of self-defense.

The issue here, therefore, is whether a victim's court-established fear of imminent bodily harm, coupled with non-excessive force – however weak – in response, is enough to justify a claim of self-defense; or whether that fear and response, once established without retraction, can be negated by additional

findings that the victim's dominant mindset was a desire for retribution, and that the force used was too lame to evidence either a fearful mindset or an attempt at self-protection.

The theory of the dissent is twofold:

> [T]he [1] necessary state-of-mind inquiry is not fully satisfied upon a conclusion that the defendant actually and reasonably believed she was in imminent danger of bodily harm, and . . . [2] the self-defense analysis also is not complete upon a further conclusion that the amount of force used was not excessive. *Post*, at 56.

Respectfully, I believe the dissenting theory is flawed.

*First*, it presupposes a threshold trial-court analysis of the defendant's mindset that requires a probe of her motives and emotions, even *after* establishing her actual and reasonable belief of imminent bodily harm. According to the dissent, such a probe, without precedent, can cancel a court's firm finding of the level of fear that the case law unequivocally says will justify a self-defense instruction (absent unreasonable force).

*Second*, the dissent's theory posits, again without precedent, that the force used can be so weak that it not only negates any effort for self-protection (thereby

negating a court-established belief of imminent bodily harm) but also negates the "reasonable force" limitation on self-defense by suggesting that an ineffectual response was too weak to be "reasonable" – a limitation that traditionally disqualifies only excessive force.

*Finally*, the dissent offers no case law that says a retributive motive ultimately displaces the justification for self-defense even though the trial court has found, without qualification, that the defendant actually and reasonably believed she was in imminent danger of bodily harm.

These concerns require elaboration.

## II.

I agree with Judge Easterly that, when evidence supports a claim of self-defense, the government has the burden of disproving beyond a reasonable doubt that the defendant (1) actually and reasonably believed she was in imminent danger of bodily harm and, in the event of such belief, (2) used only reasonable – meaning non-excessive – force to repel the attack. *Ante*, at 16–18.

Our dissenting colleague, however, advises that appellant failed to satisfy a third step: that despite an unequivocal, conclusive finding that appellant believed herself to be in imminent danger of bodily harm – a belief that ordinarily would justify self-defense (when coupled with reasonable force) – the government can disprove the defense by satisfying the court that an additional motive negated her belief, and that the force employed was weak, not defensive.

I am not persuaded. In the first place, the dissent does not dispute the trial court's unequivocal, unmodified first-step finding that appellant "reasonably believed" and "actually did fear that she was in danger of imminent bodily harm." *Ante* at 9. Therefore, the dissent's conclusion that this finding is not enough to justify a claim of self-defense (absent unreasonable force) must come either (1) from a source outside the two required self-defense findings, or (2) from a second-step finding that the force used was not "reasonable"; that is, instead of being excessive (the traditional ground for unreasonable force), the force of appellant's spitting was so unreasonably lame that, along with appellant's testimony, it nullified any motive of self-protection.

The dissent appears to take both positions. On the one hand, the dissent says the opinion for the court "fail[s] to give due attention to the lead-in clause that

dictates when the 'two-part' test is applicable," namely, that "[e]very person has the right to use a reasonable amount of force in self-defense if" steps one and two are satisfied. *Post*, at 51, 51 n.8 (emphasis omitted). This quoted lead-in clause essentially says no more than that everyone is entitled to self-defense by meeting the two requirements for self-defense; it does not give life to an additional criterion that would nullify self-defense even when the two specified requirements are satisfied.

On the other hand, the dissent relies, in the alternative, on appellant's spitting – a "predictably ineffectual," "tit-for-tat act[] of retaliation," *post*, at 49 n.6, 55 – to undermine the sufficiency of the trial court's first-step finding that appellant's fear of imminent bodily harm justified self-defense (absent unreasonable force). Under this approach, the dissent's source of erosion of that first-step finding has to be the court's second-step assessment of "reasonable force." That is to say, the dissent has to mean that appellant did not "actually" and "reasonably" believe that the weak force used – her spitting – would be enough to protect her against "imminent bodily harm." I have problems with this analysis.

First, this analysis does not appear in the trial court's findings, quoted at length in the dissent. *Post*, at 43–46. Although the trial court speculated that appellant's spitting response to her assailant had no deterrent value, *ante*, at 26 n.30, the court focused almost exclusively on appellant's expressed motivation –

"street justice"; "he spit on me first" – not on a perceived weakness in appellant's response as an independent basis for discounting her fearful, step-one mindset. Thus, absent any assertion that spitting can never count as "reasonable force" – indeed, the dissent agrees that on occasion it can, *post*, at 48 n.6 – I am concerned about appellate court fact-finding to bolster the dissent's analysis.

Second, according to the government's brief, the trial court – unlike the dissent – found that appellant, through her words, was motivated solely "by her desire to retaliate," a finding inconsistent with the court's threshold finding that appellant had "reasonably believed that she was in imminent danger of bodily harm." *Post*, at 44. Thus, the court never questioned that spitting constituted reasonable force under the circumstances, and not even the prosecution has espoused the dissent's reliance on the second-step (reasonable force) inquiry to inform the step-one (belief of imminent bodily harm) inquiry.

Third, I cannot agree that appellant's spitting can disqualify her from claiming self-defense because of its presumed weakness as a response to the neighbor who spit at her first. Appellant's response was "a proportionate reaction to the threat that [s]he perceived."[1] The trial court's perception that this response was not a reasonable deterrent to acceleration of the affray, *ante*, at 26 n.30 – *i.e.*, that (in the dissent's words) the spitting was "predictably ineffectual," *post*, at 55 – is supported only by speculation. If it is true (as I believe) that the trial court's step-one finding entitled appellant to claim self-defense (when coupled with reasonable force), I cannot believe, given the absence of supportive case law, that ineffectual force can be deemed unreasonable simply because it is too lame rather than excessive.

Finally, I will assume for sake of argument that a step-two, "reasonable force" inquiry could inform a step-one, belief-of-imminent bodily harm inquiry – *e.g.*, that a weak response to an attacker might signal that the defendant did not

---

[1] *Ewell v. United States*, 72 A.3d 127, 130 (D.C. 2013).

actually and reasonably believe that she was in imminent danger of bodily harm. But once that belief of imminent harm is established by a trial court finding, as in this case, it cannot be erased by invoking step two. My reasons follow.

## III.

According to the court's opinion, the victim's actual perceptions will inform whether the force used under the circumstances is reasonable. *Ante*, at 18–20. For example, the intensity of an imminent threat of bodily injury may provoke a frenzied retaliation in self-defense, such as a hail of bullets, that ordinarily might seem excessive but in context appears reasonable.[2] Or, in the case of a "battered spouse" defense, a wife's misperception that her husband was imminently threatening her life might justify a finding that her stabbing him was reasonable under the circumstances.[3] Therefore, when the most recent iteration of the criminal jury instruction for non-deadly force says, with regard to the second step, that one

---

[2] *See* Criminal Jury Instructions for the District of Columbia, No. 9.501C (5th ed. rev. 2016) ("In the heat of passion, a person may actually and reasonably believe something that seems unreasonable to a calm mind."); *id.* No. 5.13C (4th ed. rev. 2008) (same).

[3] *See* 2 Wayne R. LaFave, *Substantive Criminal Law* § 10.4 (c) (2d ed. 2003) (citing *State v. Kelly*, 478 A.2d 364 (N.J. 1984)).

"may use an amount of force which, at the time of the incident, s/he actually and reasonably believes is necessary to protect himself/herself from imminent bodily harm,"[4] this subjective inquiry – "actually believes" – is directed exclusively at the necessity of the force used, not at the motive for self-defense.[5] This, then, is the crucial distinction between the court's opinion and the dissent: "Actual" belief is included in step two of the self-defense inquiry only to explain what force may be "reasonable" from the viewpoint of the defendant; it is not used as a potential offset to a firm, threshold finding of actual and reasonable belief of imminent bodily harm. Once the fact-finder (court or jury) has made that step-one finding, self-defense with reasonable (not excessive) force is justified without more. And nothing in our case law justifies canceling that finding – unless the court first erases it as a mistake, which did not happen here.

---

[4]  *See* Criminal Jury Instructions for the District of Columbia, No. 9.501A (5th ed. rev. 2016) (quoted *infra* note 10).

[5]  This interpretation is consistent with our recent, reorganized formulation of self-defense in a homicide case, *Bassil v. United States*, 147 A.3d 303 (D.C. 2016), explaining self-defense as (1) an honest believe of "imminent danger of serious bodily harm or death" and the "need[] to use deadly force to save [one]self from that danger," coupled with (2) a requirement that "both those beliefs were objectively reasonable under the circumstances." *Id.* at 307.

The dissent acknowledges that not all mixed motives necessarily preclude an assertion of self-defense. *Post*, at 48.[6] But I have no idea what the dissent's formula is for deciding how many elements of retributive anger will dilute the unrebutted belief of imminent bodily harm to the point that the retributive motive can be found – as the dissent requires – to be "solely retaliatory and not defensive." *Post*, at 54. Indeed, the dissent itself indicates how difficult it is to sort out motives. It "acknowledge[s] that sometimes a defendant may be less than fully articulate or less than candid about her reason for acting." *Post*, at 58 n.14. Manifestly, therefore, in light of the trial court's finding that appellant's level of fear satisfied step one of the self-defense criteria, I do not understand how this court could conclude, with confidence, that appellant's motive was "solely retaliatory and not defensive." After all, in addition to justifying her response in part by saying "he spit on me first," she also credibly testified, "I was scared for my life, like I didn't know what they were going to do."

Judge Easterly's opinion for the court properly rejects a second-guess, weighing-and-balancing exercise once the trial court has found, without limitation,

---

[6] *See* LaFave, *supra* note 3, § 10.4 (c) ("[I]f [one] acts in proper self-defense, he does not lose the defense because he acts with some less admirable motive in addition to that of defending himself, as where he enjoys using force upon his adversary because he hates him.").

that the defendant experienced the belief of imminent bodily harm necessary to justify self-defense. I agree that it would be superfluous, indeed confusing, and contrary to the trial court's unequivocal step-one finding, to try to sort out other motives that may be at work.

In sum, the fact that the defendant may have had a mixed mentality – great fear coupled with retributive anger – is irrelevant here. The latter cannot be used to negate the former once a defendant's fear itself has been found, without caveat, to justify the use of reasonable force in self-defense.

## IV.

I add here, finally, a postscript to explain some of the jury instructions, as supported by relevant case law, that inform the majority's analysis. It is interesting to note, first, that the criminal jury instruction for non-deadly force – the force used in this case of simple assault – had initially required, for the second-step inquiry, only that the defendant had "reasonably believe[d]" – not "actually and reasonably believe[d]" – that the amount of force used in self-defense was "necessary to

protect himself/herself from imminent bodily harm."[7]  Moreover, until the court's

opinion in this case, the law applicable to simple assault has not acknowledged a

subjective component of the second step of a self-defense analysis.[8]  Thus, the

---

[7]  Criminal Jury Instructions for the District of Columbia, No. 5.13A (4th ed. rev. 2008), provides in full:

A person may use a reasonable amount of force in self-defense.  A person may use an amount of force which, at the time of the incident, s/he *reasonably believes* is necessary to protect himself/herself from imminent bodily harm. (Emphasis added).

[8]  *See Ewell v. United States*, 72 A.3d 127, 131-32 (D.C. 2013) (simple assault); *Snell v. United States*, 754 A.2d 289, 290 (D.C. 2000) (simple assault); *Guillard v. United States*, 596 A.2d 60, 63 (D.C. 1991) (simple assault); *Potter v. United States*, 534 A.2d 943, 945-46 (D.C. 1987) (simple assault); s*ee also Kittle v. United States*, 65 A.3d 1144, 1158 (D.C. 2013) (assault and felony threats); *Higgenbottom v. United States*, 923 A.2d 891, 900 (D.C. 2007) (assault with intent to kill while armed, aggravated assault while armed, assault with a dangerous weapon, mayhem while armed); *McPhaul v. United States*, 452 A.2d 371, 373-74 (D.C. 1982) (assault with a deadly weapon).

In *Ewell*, this court reversed a conviction for simple assault, holding (in part) that the trial court had erroneously instructed the jury on the use of deadly, not non-deadly, force in self-defense.  Relying on *McPhaul* and *Snell*, we held that, for non-deadly force, a defendant had to meet a "less onerous standard," showing only "a reasonable belief that he was in imminent danger of bodily harm," 72 A.2d at 131, whereas for deadly force the defendant had to show both an "*honest[]*" and a "reasonabl[e]" belief that "he was in imminent danger of *serious* bodily harm."  *Id.* at 132 (emphasis added) (internal quotation marks omitted).  In a footnote, the court also referenced the different instructions for deadly and non-deadly force in the Criminal Jury Instructions for the District of Columbia Nos. 9.501A and 9.501B (5th ed. 2009), in order to evidence the distinction between "bodily harm" and "serious bodily harm."  Presumably in light of binding case law, however, the court did not address the change from the fourth (2008) edition of the Instructions in 9.501A:  that self-defense with non-deadly force henceforth required a showing

(continued…)

dissent's apparent reliance on appellant's "actual" belief about the level of force required to dispel a mindset of fear justifying self-defense – derived from the second step of the self-defense inquiry (reasonable force)[9] – has no prior case law support.

In 2009, the pertinent criminal jury instruction for use of non-deadly force was amended to conform to the one traditionally used for deadly force.[10] Presumably, therefore, the defendant who uses non-deadly force today must have both "actually and reasonably believe[d]" that the force used was necessary for self-protection.[11] For purposes of analysis, the opinion for the court, as well as the

---

(…continued)
that the defendant "actually," as well as "reasonably," believed the amount of force used "was necessary to protect himself/herself from imminent bodily harm."

[9] See *supra* section III (explaining "the crucial distinction between the court's opinion and the dissent").

[10] *See* Criminal Jury Instructions for the District of Columbia, No. 9.501A (5th ed. 2009). This formulation of Instruction No. 9.501A remains unchanged and is found in the most recent (2016) revised version of the Criminal Jury Instructions for the District of Columbia.

[11] Instruction No. 9.501A, see *supra* note 9, provides in full:

A person may use a reasonable amount of force in self-defense. A person may use an amount of force which, at the time of the incident, s/he *actually and reasonably believes* is necessary to protect himself/herself from imminent bodily harm. (Emphasis added).

dissent, relies on that updated formulation here.[12]  Moreover, the case law

applicable to deadly force, most notably (though not exclusively) in homicide

cases, has traditionally required that same, dual belief.[13]  No explanation is offered

with the 2009 instruction as to why the amendment for non-deadly force was

adopted, but as explained above in section III, addition of "actual" to "reasonable"

belief assures attention to the defendant's subjective viewpoint in determining

whether the defendant's belief in the necessity of the force used was reasonable

under the circumstances.  It does not advert to the threshold, step-one mindset

required to justify self-defense.

---

[12]  Years ago, in an opinion concerning defense of a third person, we acknowledged that "[t]he right of self-defense, and especially the degree of force the victim is permitted to use to prevent bodily harm, is premised substantially on the victim's own reasonable perceptions of what is happening." *Fersner v. United States*, 482 A.2d 387, 391 (D.C. 1984).

[13]  The decision underlying the line of homicide self-defense cases is *United States v. Peterson*, 483 F.2d 1222, 1229-30 (D.C. Cir. 1973).  *See Bassil v. United States*, 147 A.3d 303, 306-07 (D.C. 2016); *Richardson v. United States*, 93 A.3d 178, 187 (D.C. 2014); *Edwards v. United States*, 721 A.2d 938, 941 (D.C. 1998); *Smith v. United States*, 686 A.2d 537, 544 (D.C. 1996), *cert. denied*, 522 U.S. 839 (1997); *Swann v. United States*, 648 A.2d 928, 930 (D.C. 1994); *Brown v. United States*, 619 A.2d 1180, 1182 (D.C. 1992).

In particularly violent assault cases which do not result in homicide, a deadly force instruction for self-defense may be appropriate.  *See, e.g.*, *Travers v. United States*, 124 A.3d 634, 639 (D.C. 2015) (felony assault and mayhem); *Freeman v. United States*, 912 A.2d 1213, 1220 (D.C. 2006) (assault with intent to kill while armed); *Harper v. United States*, 608 A.2d 152, 155 (D.C. 1992) (assault with a dangerous weapon); LaFave, *supra* note 3, § 10.4 (a).

# V.

I cannot help feeling that if appellant had whacked her assailant rather than spit on him, there would have been little, if any, basis for questioning whether a self-defense instruction (from the court to itself) was available in this case. Indeed, our dissenting colleague seems to agree. *Post*, at 48 n.6. But apparently the trial court rejected self-defense not because appellant lacked the belief of imminent bodily harm required to justify self-defense but, at least in part, because the court believed that the defensive response was too lame – a curious concern because the forbidden response, unreasonable force, is force too violent, not too weak (a puzzling concern our dissenting colleague shares).

To justify the dissent's analysis, the trial court might have withheld or revoked its threshold finding that appellant "actually did fear" and "reasonably believed" that she was "in danger of imminent bodily harm." But the court couldn't, and thus wouldn't, and therefore didn't – thereby precluding the analysis that our dissenting colleague presents.

*****

For the reasons expressed above, I join the opinion of the court.


THOMPSON, *Associate Judge*, dissenting: I am unable to join the majority opinion because my colleagues' analysis dispenses with the requirement that, for a claim of self-defense to be valid, the defendant must have honestly and reasonably believed that her action (that would otherwise constitute an unlawful assault) was necessary "to save h[er]self."1 The trial court, by contrast, appears to have correctly understood that if the evidence disproved that appellant Parker acted to save or protect herself from (the threatened) attack, her self-defense claim must fail.


**A.**


I will not repeat the summary of evidence set out in the majority opinion, but do need to highlight relevant portions of appellant's testimony and statements by the trial judge that reveal the court's reasoning.

---

1 *Travers v. United States*, 124 A.3d 634, 639 (D.C. 2015) (quoting *Edwards v. United States*, 721 A.2d 938, 941 (D.C. 1998)).

The trial court was very interested in why appellant spit on Powell, commenting that appellant's "state of mind is what is important." During appellant's testimony, there was the following exchange:

> THE COURT: I am going to ask this question during cross-examination so that it can be fully explored by both attorneys. Why is it that you spit in [Powell's] face?
>
> MS. PARKER: Because he came on my property and he came and spit on me first, ma'am, that's why.

Later, during defense counsel's re-direct examination of appellant, the court cautioned counsel against asking leading questions, explaining that:

> THE COURT: [T]he answer is not going to be credible if the question is leading[,] and it is an important point in my fact finding responsibility whether she spit in his face out of a sense of anger and vindication and fairness and justice or whether she spit in his face as a form of self-defense. That is a critical question of fact for me . . . .

Defense counsel then asked appellant again why she took the actions she took. She answered:

> MS. PARKER: It was just that he spit in my face and I felt scared with the way they approached me that day. They approached me in a very scary situation. I had a lot of people come approach me at one time and I really did not know what I did or what I did wrong for him to say

he was going to smack me and walk on my property and
then to spit in my face.

This echoed appellant's earlier direct testimony that, "I just know that I didn't do anything wrong." The court thereafter denied defense counsel's (renewed) motion for judgment of acquittal, stating that "a reasonable juror based on this record would be able to find that the defendant did what she did, performed the act of spitting *not in self-defense* but in anger and indignation" (emphasis added).

After closing arguments, the court found that appellant "reasonably believed that she was in imminent danger of bodily harm." The court nevertheless ruled that the government had "carried its burden of proving beyond a reasonable doubt that with respect to the . . . spitting, self-defense was not in play[.]" In explaining its ruling, the court said the following:

> THE COURT: [I]n order for self-defense to apply[,] she has to use a reasonable amount of force in self-defense. Using a reasonable amount of force because she is angry or indignant or outraged or because of injustice, if somebody spits in your face which is what he did, that person deserves to be spit on and should expect to be spit on, that is not self-defense. That is spitting but not for purposes of self-defense and the government has proven on this record that the spitting occurred not for reasons of self-defense but for those other reasons.
>
> . . .

> [E]very time [appellant] is asked, why did you spit on him, the immediate answer is, because he spit on me, and that was said directly on the scene to the police officer.[2] The answer to the same effect was indeed given to the prosecutor, I spit on him because he spit on me, and I directly asked, why did you spit on him.  [Appellant's answer was] I spit in his face because he came on my property and he spit on me first and *there is street justice in that*.  (emphasis added).

Further explaining its finding, the court referred to "what could have been expected to happen next if that police officer had not been there" when appellant spit on Powell.  Crediting appellant's testimony to the effect that Powell was "backed up by his mother" and that "half a dozen members of his family were also approaching [appellant] and backing him up[,]" the court reasoned that:

> THE COURT:  Powell[,] backed up by his family and surrounding [appellant] the way he was and having just been spat on[,] would have made good on some of th[e] threats [he had made to appellant], not the shoot you threat[,] but the beat the S part of the threat.  [Powell's side] had the numbers and they had the anger and they had their expressed motivation.

---

[2]  The police officer who responded to the scene testified that appellant "explained to me clearly that she wouldn't just spit on him for no reason, that he spit on her first . . . ."

The court found that appellant "did not spit on Mr. Powell as an act of self-defense[,]" i.e., that "the spitting occurred not for reasons of self-defense but for those other reasons."

**B.**

The court's statements quoted above reflect a recognition that what was missing each time from appellant's explanation of why she spit on Powell was any statement to the effect that she spit on him in an effort to protect herself from harm.[3] Appellant had every opportunity to respond, "I spit on Powell to make him and his family go away" or "to make them stop bothering me," or something to that effect,[4] but she gave no such response (and instead repeatedly mentioned not

---

[3] I do not mean to imply that appellant bore the burden to prove that she acted in self-defense. I agree with my colleagues that it was "the government's burden to prove that she did not." *Ante*, at 14 n.13 (majority opinion). However, in determining whether that burden was met, the trial court was entitled to consider all the evidence, including appellant's own testimony — and glaring omissions in that testimony — about why she spit on Powell.

[4] *Cf. Ewell v. United States*, 72 A.3d 127, 128, 132 (D.C. 2013) (internal quotation marks omitted) (describing the defendant's testimony that he struck the complainant in the face because, after throwing a cup of vodka at him and hitting him in the mouth, she "'was still coming' at him" and he feared she had a knife and might pull it out and stab him; remanding the case to the trial court for reconsideration of defendant's self-defense claim, because the court had failed to

(continued…)

only Powell's having spit at her when she had done nothing wrong, but also the affront of his coming onto her property). Nor did appellant describe her act of spitting on Powell as a merely reflexive action, as she had effectively done when explaining why she threw a can into the street (an action she took, according to the officer, before she spit on Powell):

> MS PARKER: I threw [the can] in the middle of the street. I didn't throw it at him exactly. I just threw it, the can. I just threw the can. I don't know, I was scared. I don't know. I don't know.

The court's statements quoted above also appear to reflect an assessment by the court that, given the evidence that Powell was "backed up by [a half-dozen or more angry members of] his family," no reasonable person could have believed that appellant's spitting at Powell would protect appellant from harm.

Thus, the court's key factual finding and reasoning were as follows: First, the court found that appellant's motive in spitting on Powell was to effect "street justice" (i.e., retribution, revenge, or retaliation), and was not at all to defend

---

(…continued)
account for the testimony "tending to show that appellant acted to protect himself").

herself.[5] *See generally* 2 Wayne R. LaFave, *Substantive Criminal Law* § 10.4 (c) (2d ed. 2003) (stating that a defendant acting in self-defense "does not lose the defense because [s]he acts with some less admirable motive *in addition to that of defending* [*her*]*self*" (emphasis added)). My colleagues observe that appellant "never indicated that she had the 'street justice' motive that the court imputed to her," *ante*, at 12 (majority opinion), but they stop short of concluding that the trial judge made a "factfinding error." *Ante*, at 16 (majority opinion).

Second, the court reasoned that appellant could not have reasonably thought that her spitting at Powell would extricate her from danger, i.e., cause Powell and his family to leave her alone.[6] Yet, per this court's case law discussed below, that

---

[5] The court's focus was not on (as the concurrence puts it) "how many elements of retributive anger" it takes to defeat a claim of self-defense. *Ante*, at 36 (concurring opinion). The issue the court resolved was whether appellant's spitting on Powell was *at all* an effort to repel the attack that was threatened by Powell and the half-dozen members of his family who had approached appellant and were backing Powell up, or instead was merely appellant's effort to satisfy her (admittedly understandable) desire for retribution.

[6] I suspect the trial judge would have had no trouble concluding that appellant had acted in self-defense if she had, for example, grabbed a stick and brandished it at Powell and his family members, or if she had pulled out a can of pepper spray and let them have it. Both of those actions are, at least arguably, more aggressive actions than spitting, and our public policy surely is not to encourage an escalation of aggressive conduct. But, as a policy matter reflected in the common law, we tolerate a victim's violent actions designed to stop a first aggressor's assaultive action, and do not tolerate a victim's violent actions that

(continued…)

is what a defendant must have believed to avail herself of the defense of self-defense.

## C.

In numerous cases involving claims of self-defense, this court has said the following or its equivalent: "One who is defending against an assault charge, who is claiming self-defense, *must have honestly and reasonably believed* that he was in imminent peril of death or serious bodily harm, and *that his response was necessary <u>to save himself</u>.*" *Travers*, 124 A.3d at 639 (italics and underscoring added, internal quotation marks omitted; citing cases); *see also,* e.g., *Higgenbottom v. United States*, 923 A.2d 891, 900–01 (D.C. 2007) (approving an instruction that told the jury, *inter alia,* that "[a] person may use an amount of force which, at the time of the incident, he *reasonably believes is* necessary <u>to protect himself</u> from

---

(…continued)
amount to nothing more than tit-for-tat acts of retaliation (and that risk elevating the first aggressor's threatening conduct). None of this is to say, of course, that spitting could never be a defensive act against a violent aggressor. As one court has explained, "[i]t is not difficult to imagine a scenario in which spitting could conceivably constitute a use of force in self-defense — for example, where a person who has been placed in a chokehold spits at the aggressor to get him to loosen his grip." *State v. Markou*, No. 104,931, 2011 Kan. App. Unpub. LEXIS 505, at *6 (Kan. Ct. App. July 5, 2011).

imminent bodily harm" (italics and underscoring added)); *Potter v. United States*, 534 A.2d 943, 946 (D.C. 1987) ("[T]he jury could have found that appellant . . . *believe[d], reasonably, that he had to throw a brick to fend off* imminent bodily harm." (italics and underscoring added)); *McPhaul v. United States*, 452 A.2d 371, 373 & 373 n.1 (D.C. 1982) (referring to "our standardized jury instructions" stating that "[a] person may use an amount of [nondeadly] force which, at the time of the incident, he *reasonably believed was necessary to protect himself* from imminent bodily harm.") (italics and underscoring added)); Criminal Jury Instructions for the District of Columbia, No. 9.501 (5th ed. 2016) ("A person may use an amount of [non-deadly] force which, at the time of the incident, s/he actually and reasonably believes is necessary to protect himself/herself from imminent bodily harm.").[7]

---

[7] Like *Travers*, many of our cases articulate essentially the same state-of-mind standard in the context of a defendant's use of deadly or potentially deadly force. *See, e.g.*, *Bassil v. United States*, 147 A.3d 303, 306-07 (D.C. 2016) (explaining that the use of deadly force in self-defense is justified if the defendant "*honestly believed* she was in imminent danger of serious bodily harm or death, and that *she needed to use deadly force to save herself from that danger*" and if "both those beliefs were objectively reasonable under the circumstances" (italics and underscoring added)); *Edwards v. United States*, 721 A.2d 938, 941 (D.C. 1998) ("The defender *must have believed* that he was in imminent peril of death or serious bodily harm, and *that his response was necessary to save himself* therefrom. These beliefs must not only have been honestly entertained, but also objectively reasonable in light of the surrounding circumstances. It is clear that no less than a concurrence of these elements will suffice." (quoting *United States v. Peterson*, 483 F.2d 1222, 1229 (D.C. Cir), *cert. denied*, 414 U.S. 1007 (1973)

(continued…)

The foregoing citations demonstrate that what is firmly grounded in this court's case law (as well as in logic) is that a person acts *in self-defense* only when her action is an effort to save or protect herself or to fend off harm. While my colleagues make much of what they call our jurisdiction's "two-part test" for self-defense," *ante*, at 16 (majority opinion), they fail to give due attention to the lead-in clause that dictates when the "two-part test" is applicable: the statement that there is a right to use a "reasonable amount of force" (defined as applicable here by the non-deadly force paragraph of standardized jury instruction 9.501) "*in self-defense*."[8] That is why — and it is no mere tautology to say it — a claim that the

_____

(…continued)

(footnote signals omitted, italics and underscoring added)); *Harper v. United States*, 608 A.2d 152, 155 (D.C. 1992) ("The defender *must have believed* that he [or she] was in imminent peril of death or serious bodily harm, and *that his [or her] response was <u>necessary to save himself</u> [or herself]* therefrom." (italics and underscoring added) (quoting *Peterson*); *see also Freeman v. United States*, 912 A.2d 1213, 1220 (D.C. 2006) ("In order to raise a claim of self-defense, a defendant must show . . that his response was necessary *to save himself from the danger*." (italics added) (citing *Brown v. United States*, 619 A.2d 1180, 1182 (D.C. 1992) (citing cases))).

[8] *See* Criminal Jury Instructions for the District of Columbia, No. 9.500 (5th ed. rev. 2016) ("Self Defense—General Considerations"), providing in pertinent part that "[e]very person has the right to use a reasonably amount of force in self-defense if (1) s/he actually believes s/he is in imminent danger of bodily harm and if (2) s/he has reasonable grounds for that belief.") (emphasis added); *see also, e.g.*, *Snell v. United States*, 754 A.2d 289, 290 (D.C. 2000) ("Reasonable force may be

(continued…)

defendant acted in self-defense may be disproved by evidence establishing or supporting an inference that the defendant did not act in an effort to avert, protect against, or save herself from danger. In other words, to prevail on a claim of self-defense, one must have acted "in self-defense," i.e., acted in order to defend oneself; if the defendant acted purely for retribution, her action was not in self-defense.[9] For that reason, I cannot agree with my colleagues that the defendant's "[m]otive is not separately and additionally considered as a basis for disproving a claim of self-defense." *Ante*, at 3 (majority opinion).[10] Nor can I agree that the

---

(…continued)
used in self-defense if the actor reasonably believes that he or she is in imminent danger of bodily harm." (emphasis added)).

[9] In my view, these are quite unremarkable propositions. My colleagues in the majority, too, recognize that what is "entirely congruent with [a] claim of self-defense" is action "to repel the reasonably perceived danger[.]" *Ante*, at 14 (majority opinion).

To be clear, I do not suggest that a person who uses force after being assaulted by an aggressor may not have a mixture of *emotions*, including emotions such as anger, hate, or indignation. Indeed, I expect that any person in that situation would be quite likely to have a mix of emotions. But to be entitled to the defense of self-defense, the person must have used force not purely as an expression of those emotions, but in an effort to repel the imminent danger of bodily harm. A person may use "reasonable force *to repel* the perceived attack." *Higgenbottom*, 923 A.2d at 900 (emphasis added).

[10] I agree with my colleagues that "[t]he essence of the *self-defense situation* is a reasonable and bona fide belief of the imminence of . . . bodily harm (emphasis added)," *Kinard v. United States*, 96 F.2d 522, 526 (D.C. Cir. 1938), but the fact that the situation was one that would have justified efforts at self-defense does not mean that the defendant actually acted in self-defense. I agree that "the threshold

(continued…)

trial court "erred as a matter of law in conducting a separate inquiry" into why appellant spit on Powell.[11]  *Ante*, at 2 (majority opinion).  I do not mean to imply that such an inquiry will be necessary in every case.  But, where (as here) the nature of the force the defendant used, or the defendant's testimony, or other factors fairly raise the issue of whether the defendant undertook force in an actual effort to protect herself, the inquiry is appropriate and may be necessary.  And while it may be difficult to prove that "there was another motive guiding the

---

(…continued)

question for the fact finder is whether the government has disproved that the 'appellant actually and reasonably believed that [s]he was in imminent danger of bodily harm[,]'" *Higgenbottom*, 923 A.2d at 900, but that threshold question is not the only relevant question.

[11]  The court's inquiry was consistent not only with our case law discussed *supra*, but also with a common-law principle that is over a century old.  *See, e.g.*, *Lyons v. People*, 27 N.E. 677, 682 (Ill. 1891) (approving a self-defense instruction that told the jury, "It must appear that *the circumstances* were sufficient to excite the fears of a reasonable person, and that the party killing really acted under the influence of those fears *and not in a spirit of revenge*") (second set of italics added); *Wortham v. State*, 70 Ga. 336, 339 (Ga. 1883) (explaining that for a homicide to be justifiable, "[i]t must appear that the circumstances were such as to excite the fears of a reasonable man; and it must also further appear that he acted under those fears, and *not in a spirit of revenge*") (italics added).  I also note that issues such as those we have had to consider in this case continue to be discussed in the academic literature.  *See, e.g.*, Stephanie Spies, *Malice Aforethought and Self-Defense: Mutually Exclusive Mental States?*, 91 N.Y.U. L. REV. 1027, 1046 (Oct. 2016) (discussing a category of cases finding retaliation/revenge and self-defense incompatible); *see also* Martin R. Gardner, *The Mens Rea Enigma: Observations on the Role of Motive in the Criminal Law Past and Present*, 1993 Utah L. Rev. 635 (1993).

defendant's action," *ante*, at 16, if the credited evidence proves that such other motive(s) alone, and not defense of self, was the defendant's reason for using force, the government will have met its burden to rebut the defendant's claim of self-defense.

In this case — one in which the issue is whether the evidence permitted the court to find that appellant's use of force was solely retaliatory and not defensive — we may not rest on the truncated discussions of the law of self-defense found in some of our cases. *See, e.g.*, *Kittle v. United States*, 65 A.3d 1144, 1158 (D.C. 2013) ("To invoke self-defense, there must be some evidence that: (1) appellant actually believed he was in imminent danger of bodily harm, and (2) he had reasonable grounds for that belief." (internal quotation marks and brackets omitted) (quoting *Guillard v. United States*, 596 A.2d 60, 63 (D.C. 1991))). The abbreviated articulation of the law of self-defense in *Kittle* and similar cases sufficed in those cases because the issue was simply whether the defendant believed he was in danger of imminent harm; the issue was not the motive for the use of force or even the proportionality of the force the defendant used. *See Kittle*, 65 A.3d at 1160 ("[T]here was no evidence, 'however weak,' to establish that appellant acted out of a fear of imminent harm."); *Snell*, 754 A.2d at 291 ("[T]here was evidence upon which a reasonable mind could find beyond a reasonable doubt

that appellant did not reasonably believe he was in imminent danger of bodily harm[.]").

Discussions of the self-defense standard in other cases add to the required inquiry whether, objectively, the force used by the defendant was reasonable or necessary. *See, e.g.*, *Higgenbottom*, 923 A.2d at 900 ("[T]he central questions for the jury were (1) whether appellant [who was charged with striking his assailant with a pipe] actually and reasonably believed that he was in imminent danger of bodily harm, and (2) whether he used *only reasonable force* to repel the perceived attack." (italics added)). Formulations like this have been used when the focus of analysis was on whether the force the defendant used was excessive, not on whether the defendant used force that was so predictably ineffectual as not to qualify as force the defendant believed was necessary to protect herself. It appears that, until now, the latter issue simply has not arisen.

This court's articulations of the self-defense standard that are on point here establish that an act is not taken in self-defense unless it is intended to be (and could reasonably be thought to be) defensive.[12] Our most pertinent explications of

---

[12] I note tangentially that I take no issue with the statement that "[i]n the heat of passion, a person may actually and reasonably believe something that

(continued…)

the standard dictate that, at least in some cases (and this is such a one), the necessary state-of-mind inquiry is not fully satisfied upon a conclusion that the defendant actually and reasonably believed she was in imminent danger of bodily harm, and that the self-defense analysis also is not complete upon a further conclusion that the amount of force used was not excessive. We must ask in addition (as the trial court in this case did) whether the appellant acted to protect herself (or whether, instead, she acted merely in retaliation, or only so as to "give as good as she got," *ante* at 14 (majority opinion), or solely to vindicate her sense that there was nothing she "did wrong" to precipitate her assailant's attack).

### D.

All the foregoing said, I am not prepared simply to affirm appellant's conviction, because it appears that the trial court, in reasoning that appellant could not have reasonably believed that spitting on Powell might extricate her from danger, failed to take into account some of the rebuttal testimony by Officer Bradley. Officer Bradley testified on rebuttal that when he came upon the scene,

---

(…continued)
seems unreasonable to a calm mind." Criminal Jury Instructions for the District of Columbia, No. 9.501.C.

he observed "two families or two groups of family and friends yelling at each other on behalf of who[m]ever they were with." On appellant's side, there was "the actual driver of the vehicle that was out there[,]" who "was kind of the calming person trying to calm everybody down." There were also "a few other people" "standing in the general area," who "looked like they were on the defendant's side. It "seemed like" these people on appellant's side were yelling in Powell's direction and that they "weren't happy with" Powell.

In explaining its verdict and the rejection of appellant's self-defense claim, the trial court did not mention Officer Bradley's testimony about the "other people" on appellant's side and thus did not explicitly credit or discredit the officer's testimony in this regard. As described above, the court emphasized that Powell's side "had the numbers and they had the anger" and reasoned that if Officer Bradley had not arrived just before appellant spit on Powell, Powell and the group of people on his side "would have made good on some of th[e] threats" he had made to appellant and predictably would have "beat the S" out of appellant (a forecast of violence that was not entirely speculative given appellant's testimony that sometime prior to this incident, Powell had "jumped [appellant's] daughter"). The court did not consider, however, whether, in a context where appellant had a "few other people" on her side who were showing anger toward Powell, appellant

could honestly and reasonably have believed that her act of spitting on Powell could serve as a deterrent to further violence by Powell or the people who were on his side.

To put it differently, even if appellant could not reasonably have thought that spitting would protect her in a situation where she was alone against Powell and his several family members, it is less clear that she could not reasonably have thought that spitting would protect her in the situation Officer Bradley described. And because all the evidence, and not just the defendant's testimony, is relevant to a finding about what the defendant who asserts a claim of self-defense could reasonably have believed (and to an inference about what she actually did believe),[13] I believe the trial court's sole focus on appellant's testimony was insufficient.[14] If credited, Officer Bradley's testimony about there being a "few

---

[13] *Cf. Guillard*, 596 A.2d at 63 (concluding that defendant was entitled to an instruction on self-defense, even though defendant himself denied ever striking the complaining witness, because other evidence, including testimony that the complainant was violent and aggressive and had thrown items at the defendant, "fairly raised the issue of self-defense"); *Gray v. United States*, 549 A.2d 347, 349 n.2 (D.C. 1988) ("[A] defendant is entitled upon request to an instruction on any issue fairly raised by the evidence, regardless of whether it is consistent with the defense theory of the case or the defendant's testimony.").

[14] This is not to agree with my colleagues' assertion that "it is difficult if not impossible to accept that [appellant's] he-spit-on-me-first statement alone establishes, beyond a reasonable doubt, that [appellant was motivated solely by a

(continued…)

other people" on appellant's side could permit the inference that appellant acted in self-defense and would possibly change the court's calculus and impact its finding about whether the government met its burden of proving beyond a reasonable doubt that appellant did not act in self-defense.[15] I would vacate the conviction and remand the case for the trial court to reconsider its ruling after considering Officer Bradley's testimony in its entirety. [16]

---

(…continued)
desire to impose 'street justice.'" *Ante*, at 14 (majority opinion). Rather, it is to acknowledge that sometimes a defendant may be less than fully articulate or less than candid about her reason for acting, and that the court must consider all the evidence, not just the defendant's testimony, before drawing an inference about why she acted as she did.

[15] Contrary to the suggestion in the concurrence, I do not suggest that appellant's weak response signaled that the she did not actually and reasonably believe that she was in imminent danger of bodily harm (and the trial court, which expressly found that appellant believed that she was in imminent danger of bodily harm[,]") certainly did not suggest or infer that). To repeat, the point I make (and the point I believe the trial court recognized) is that the weakness of appellant's spitting response raises an issue of whether she actually and reasonably believed that spitting on Powell could help repel the danger in which she found herself, danger posed not only by Powell but also by the half-dozen or so members of his family were also approaching appellant and "backing him up[.]" Appellant testified that she "didn't know what *they*" — people "known in the neighborhood to cause trouble" —w[ere] going to do" (emphasis added).

[16] The court's task on remand would include determining, in light of the officer's testimony about the presence of some of appellant's family members on the scene, whether appellant's spitting on Powell "was too lame to evidence . . . an attempt at self-protection," *ante*, at 28 (concurring opinion), because it was not a proportionate reaction to the "very scary situation" she perceived from the "like eight people [on Powell's side]" who "approach[ed] [her] at one time."

**E.**

The final observations I will make about the majority opinion are these: First, in focusing only on whether the defendant feared imminent bodily harm and whether she used excessive force, the majority opinion gives short shrift to the rule that, even as to non-deadly force, "[t]he right of self-defense is a law of necessity, arising only when the necessity begins, and equally ends with the necessity."[17] Second, the opinion does damage to the principle that none of us is entitled to "take redress into []our own hands."[18] Third, the majority's holding — that when self-defense is raised, the only proper inquiry with respect to a defendant's mental state is whether she subjectively and reasonably believed she was in imminent danger of bodily harm — is not a "reaffirm[ation]," as my colleagues assert, *ante*, at 26 (majority opinion), but a new pronouncement that takes advantage of the unusual facts of this case to abandon the principle that a valid claim of self-defense also requires *a belief by the defendant that the force she used was necessary to*

---

[17] *Harper*, 608 A.2d at 154 (D.C. 1992) (quoting *United States v. Peterson*, 483 F.2d 1222, 1229 (D.C. Cir.), *cert. denied*, 414 U.S. 1007 (1973)).

[18] *State v. Ouellette*, 37 A.3d 921, 926 n.2 (Me. 2012) ("Self-defense is defensive, not retaliatory: You may prevent an injury from being done by all proper means, but, when done, you cannot take redress into your own hands." (internal quotation mark omitted)).

*protect herself* from imminent danger.  I do not understand on what authority my colleagues believe they are free to renounce that principle.  *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("[W]e have adopted the rule that no division of this court will overrule a prior decision of this court . . . and that such result can only be accomplished by this court en banc."  (footnote omitted)).